UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BROOKLYN SAND & GRAVEL, LLC<br>& WAYNE JOLLEY<br>    Plaintiffs, | :<br>:<br>:<br>: | CIVIL CASE NO.<br>3:21-cv-193 (JCH) |
| v. | :<br>: | |
| TOWN OF BROOKLYN,<br>    Defendant. | :<br>:<br>: | June 7, 2023 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 43)**

**I.    INTRODUCTION**

Brooklyn Sand & Gravel, LLC ("BS&G") and Wayne Jolley ("Mr. Jolley" and, collectively, "the plaintiffs") bring this action under section 1983 of title 42 of the United States Code ("section 1983") against the Town of Brooklyn ("Brooklyn" or "the defendant").  The plaintiffs claim that Brooklyn violated their rights to substantive due process as guaranteed by the Fourteenth Amendment of the United States Constitution in refusing to grant a special zoning permit for onsite processing of sand and gravel imported from locations outside their Brooklyn property.

Brooklyn moves for Summary Judgment.  See Motion for Summary Judgment ("Def.'s Mot.") (Doc. No. 43); Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem.") (Doc. No. 43-1); see also Defendant, Town of Brooklyn's 56(a)(1) Statement of Undisputed Material Facts ("Def.'s LR 56(a)1 Stmt.") (Doc. No. 43-2); Defendant, Town of Brooklyn's Reply to Plaintiff's Opposition to Summary Judgment ("Def.'s Reply") (Doc. No. 56).  The plaintiffs oppose the Motion.  See

Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl.'s Mem.") (Doc. No. 49); see also Plaintiffs' Local Rule 56(a)2 Statement of Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s LR 56(a)2 Stmt.") (Doc. No. 49-1); Additional Material Facts ("Pl.'s LR 56(a)2(ii) Stmt.") (Doc. No. 49-1).

For the reasons discussed below, the court denies Brooklyn's Motion.

## II.    BACKGROUND[1]

BS&G, owned and operated by Mr. Jolley, runs a sand and gravel processing facility in Brooklyn, Connecticut (hereinafter the "Brooklyn Property"). Pl.'s LR 56(a)2(ii) Stmt. ¶¶ 1, 8.[2] The facility processes and sells sand and gravel excavated from areas located on the property in Brooklyn, as well as "sand and gravel that it purchases and imports from other locations and processes onsite." Id. at ¶ 3. The processed sand and gravel is sold to "companies and municipalities for use in the manufacture of concrete." Id. at ¶ 2. This Brooklyn Property was used in a similar manner since at least the early 1960s, id. at ¶¶ 4–6, and it housed a sand and gravel business since the early 1970s, id. at ¶ 7. Although Brooklyn first adopted zoning regulations in 1972, it was "many years" before Mr. Jolley became "required to obtain a permit in order to process sand and gravel, whether it was material excavated from onsite or imported from offsite." Id. at ¶ 10.

---

[1] The court draws from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts. As it must, the court construes all disputed facts in the light most favorable to the plaintiffs, the non-moving party.

[2] For ease of reference, the court cites primarily to the plaintiffs' Local Rule 56(a)2 and Local Rule 56(a)2(ii) Statements because, in accordance with Local Rule 56(a)2, the Local Rule 56(a)2 Statement contains a reproduction of each numbered paragraph from the defendant's Local Rule 56(a)1 Statement, as well as the plaintiffs' admissions/denials. The additional material facts laid out in the plaintiffs' Local Rule 56(a)2(ii) Statement are also referenced, where appropriate, where the court has verified that the particular facts are supported by material cited by the plaintiffs.

BS&G had obtained either a new special permit or a renewal of a special permit from the Brooklyn Planning and Zoning Commission (hereinafter the "PZC", or "Commission") to continue its operations for each year in which Brooklyn required such permits. Id. at ¶ 13. In 2017, BS&G applied for a special permit to excavate 100,000 cubic yards of material from the Brooklyn Property, Application for Gravel Bank Special Permit ("2017 Application"), Pl.'s Ex. U at 1 (Doc. No. 49-31), which was granted with the condition that the "quantity of imported material [could] not exceed the amount mined onsite, in accordance with [Brooklyn zoning r]egulations[,]" Pl.'s LR 56(a)2(ii) Stmt. ¶ 16. That year, only 53,000 cubic yards of material was removed from the Brooklyn Property. Id. at ¶ 19. In 2018, BS&G applied for and received a renewal permit to remove the remaining 47,000 cubic yards. Id. at ¶ 20.

The application which gave rise to the instant action was filed with the PZC the following year, in 2019 (the "2019 Application"), and it requested "the excavation of 112,000[3] cubic yards of material in two phases," as well as the ability to continue processing imported sand and gravel. Pl.'s LR 56(a)2 Stmt. ¶ 4. At the same time, BS&G also applied for four variance requests with the Zoning Board of Appeals (hereinafter the "ZBA"). Id. at ¶ 9. The PZC accepted the 2019 Application at a public hearing held on March 6, 2019, Pl.'s LR 56(a)2(ii) Stmt. ¶ 24, but it opted to take no action on the Application until after the ZBA ruled on the variance requests, id. at ¶ 26. One of the requested variances "sought permission to increase the amount of material

---

[3] The initial application requested an excavation of 218,000 cubic yards, but it was amended to the above-described amount when BS&G failed to secure a variance to increase the amount of imported material to the Brooklyn Property. Pl.'s LR 56(a)2(ii) Stmt. ¶ 41.

3

BS&G imports from other sites for processing onsite."[4]  Id. at ¶ 23.  The PZC Chairperson, Michelle Sigfridson ("Ms. Sigfridson") was particularly opposed to this variance request.  Id. at ¶ 31.

The PZC decided to submit a memorandum to the ZBA regarding the propriety of the variance requests, despite one Commission member's feeling that it was improper for the PZC to express its views to the ZBA, a separate municipal entity.  Id. at ¶¶ 29, 32, 35.  Brooklyn's land use attorney, however, had suggested that, "if the Commission believed the variances BS&G was seeking would not be in the 'spirit of the Zoning Regulations,' the Commission could submit [the] memorandum to the ZBA expressing its views."  Id. at ¶ 27.  At a PZC public hearing on April 3, 2019, the PZC discussed the memorandum and read ZBA minutes regarding BS&G's pending variance application.  Town of Brooklyn Planning and Zoning Commission Regular Meeting April 3, 2019 ("4/3/19 PZC Meeting Transcript"), Pl.'s Ex. E at 14:31–33 (Doc. No. 49-10).  The PZC noted that the hardship BS&G cited in support of its variance request was "that the subject property has historically processed imported material as well as material mined on site and that that predates zoning".  Id.  Ms. Sigfridson continued, "so it seems like they're asking for a variance because they're claiming that they're grandfathered."  Id. at 14:33–35.  The PZC's memorandum was submitted, and it was later cited by the ZBA as one of the factors that led it to deny BS&G's variance requests.  Pl.'s LR 56(a)2(ii) ¶ 39.

---

[4] One of Brooklyn's Zoning Regulations provided that "[m]aterial processed on site shall be [m]aterial excavated on-site and [m]aterial excavated off-site and transported to the subject site for processing provided that the annual quantities of same does not exceed that processed and mined on-site."  Id. at ¶ 11 (internal citation omitted).

The PZC held public hearings on BS&G's 2019 Application on May 21, June 5, June 18, and July 2, 2019.  Id. at ¶ 40.  At these hearings, BS&G's civil engineer "provided evidence showing that BS&G had complied with [the] conditions imposed by prior permits[,]" id. at ¶ 42, and reports were submitted which "document[ed] the number of truck trips per quarter and the volume of imported material brought to [the Brooklyn Property,]" id. at ¶ 43.  BS&G was required by the prior Special Permits to limit the number of truck trips per day to a maximum of eighty and to keep the average number of trucks trips per day under sixty.  Id.  During a walk of the Brooklyn Property on May 29, 2019, PZC members saw "only one truck" enter BS&G's facility.  Id. at ¶ 54.

Nevertheless, "[t]here was strong neighborhood opposition" to BS&G's 2019 Application.  Pl.'s LR 56(a)2 Stmt. ¶ 14.  Residents complained about "excessive noise, dust and truck traffic" from BS&G's facility.  Pl.'s LR 56(a)2(ii) at ¶ 54.  While the possibility of installing truck counters was discussed as a remedy to some neighbors' claim that BS&G's violated the truck number requirements, id. at ¶ 58, there was strong sentiment that the neighbors wanted the soil and gravel processing at the Brooklyn Property to end, see, e.g., id. at ¶ 62.  Ms. Sigfridson's father, Jean Fleming, was vocal about his desire to see the processing cease: "Why prolong [the end of BS&G's processing] by granting [BS&G] the right to import material?  Why not say, okay, get some more equipment in there and process what you've got and let's shut it down and restore it?"  Pl.'s LR 56(a)2(ii) Stmt. ¶¶ 49, 51.  Ms. Sigfridson echoed this suggestion: "Just so everybody knows, this is my dad right here.  I grew up across the street from this gravel pit too, so thanks dad.  We know what the concerns are and when I say it's the time, we get that."  Id. at ¶ 52.  At a later meeting, Ms. Sigfridson suggested that a

5

draft condition related to "imported materials and how it would be counted . . . be stricken and replaced by something that says no material shall be imported onsite." Town of Brooklyn Planning and Zoning Commission Regular Meeting July 2, 2019, Pl.'s Ex. Q at 22:4–6 (Doc. No. 49-27).  The 2019 Application was approved and a Special Permit was issued on July 2, 2019 but, in line with Ms. Sigfridson's proposal, it included a condition (hereinafter "Condition 4") that "[m]aterial excavated on site may be processed, but no off-site material shall be imported to the site for processing or other uses after August 1, 2019."  Town of Brooklyn Record of Special Permit ("2019 Special Permit"), Pl.'s Ex. Z at 1 (Doc. No. 49-36).

BS&G timely appealed the PZC's decision to grant the 2019 Special Permit with a limitation on imported materials to the Connecticut superior court (hereinafter "State Court Appeal").  Pl.'s LR 56(a)2(ii) Stmt. ¶ 74.  The Superior Court sustained the appeal and, while it "address[ed] all arguments" made by BS&G, it "f[ound] that one argument [was] sufficient to vitiate the imposition of Condition 4: the Chair of the Commission", Ms. Sigfridson, had a "conflict of interest and not only failed to recuse herself, but used her influence and clear predisposition against the Application to gain approval of Condition 4 even when there were viable alternatives."  Brooklyn Sand & Gravel, LLC v. Plan. & Zoning Comm'n of the Town of Brooklyn, No. LNDHHDCV196119135S, 2020 WL 8415076, at *5 (Conn. Super. Ct. Dec. 2, 2020).  This, the court reasoned, was against Connecticut General Statutes section 8-11, which provides that "'no member, directly or indirectly interested in a personal or financial sense in 'any matter' coming on for a decision or hearing of the commission may participate in that hearing.'"  Id.

6

(quoting Thorne v. Zoning Commission, 178 Conn. 198, 202 (1979)).  Critically, the court stated:

> In this case, [Ms.] Sigfridson's personal interest[,] . . . by itself, would warrant her disqualification.  However, . . . [Ms.] Sigfridson clearly exercised improper influence upon the [PZC], including her encouragement that the [PZC] take the extremely unusual and, arguably improper, action to influence the ZBA and her repeated refusal to even consider measures suggested by other [PZC] members and the town planner which would have obviated the need for Condition 4.

Id. at *6.

While the Connecticut Superior Court "believe[d] that the conflict of interest discussed above [was] sufficient to invalidate Condition 4 of the [2019 Special P]ermit," it nonetheless "address[ed] the other arguments raised by the plaintiffs[:]" (1) that "the imposition of Condition 4 was arbitrary and illegal in that the Commission violated the prior application rule," (2) that the Condition's imposition "was not based on substantial evidence", and (3) that the "imposition of . . . Condition [4] terminated a pre-existing, nonconforming use."  Id. at *7.  The Court ruled in plaintiff's favor on all four of these grounds.  Id. at *10.

Ruling in the plaintiff's favor, the court declared Condition 4 to be "null and void." Id.  The court held that, "[f]or the foregoing reasons[,] the Condition 4 of the [2019 S]pecial [P]ermit is null and void."  Id. at *10.  Before adopting the final version of its 2019 Special Permit, the PZC had drafted the language of Condition 4 very differently (hereinafter "Draft Condition 4").  Draft Condition 4 read, in relevant part, that "[t]he quantity of imported material may not exceed mined material in accordance with the Brooklyn Zoning Regulations as measured by truckloads and converted to cubic yards. . . ."  Id.  The Superior Court instructed the PZC to strike Condition 4 as it was written in

7

the final approval document and replace it with the language of Draft Condition 4.  Id. The PZC, as the defendant in the state court appeal, filed a petition for certification to the Connecticut Appellate Court, but that Petition was denied.  Pl.'s LR 56(a)2(ii) Stmt. ¶ 86.

On February 17, 2021, BS&G and Mr. Jolley filed the Complaint in the instant action.  This court granted the plaintiffs' Motion (Doc. No. 13) to voluntarily dismiss the Second Count of the Complaint on May 11, 2021.  See Order (Doc. No. 14).  Brooklyn moved for summary judgment on the plaintiffs' sole remaining count of substantive due process.  Def.'s Mot. at 1.

For the reasons discussed below, Brooklyn's Motion is denied.

### III.     LEGAL STANDARD

A motion for summary judgment may be granted only where the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  The role of a district court in considering a motion for summary judgment "is . . . only to determine whether, as to any material issue, a genuine factual dispute exists."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  In making this determination, the

district court "may not make credibility determinations or weigh the evidence." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (internal citations and quotation marks omitted). Rather, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

## IV.   DISCUSSION

In support of its Motion for Summary Judgment, Brooklyn challenges the plaintiffs' theory of Monell liability. Def.'s Mem. at 23. Further, Brooklyn argues that the plaintiffs' substantive due process claim fails as a matter for law because the Plaintiffs do not possess the protected property interest that they claim has been infringed. Id. at 4. Finally, Brooklyn argues that, even if the plaintiffs did possess a protected property interest in the right to import sand and gravel, they cannot prove that they were deprived of such interest through the high degree of egregious conduct required to succeed on a substantive due process claim. Id. at 14.

### A.   Monell Liability

Brooklyn urges this court to grant its Motion for Summary Judgment because the plaintiffs' Monell claim fails as a matter of law. Id. at 23. Brooklyn explains,

> Here, the Plaintiffs' Complaint identifies a number of Town officials, most from the Planning and Zoning Commission. However, at no point do Plaintiffs state which, if any, of the identified Town officials are a final policymaker, nor do they identify or address which of the alleged conduct constitutes the same. . . . Notably, Plaintiffs fail to plead any theory of Monell liability whatsoever in their Complaint.

Id. at 25. The plaintiffs acknowledge that, in certain paragraphs in their Complaint, the term "Town" is used when the term "Commission" should have been. Pl.'s Mem. at 24. Nevertheless, the plaintiffs argue that "a fair reading of the Complaint in its entirety

9

provides that it was the Commission's action in issuing the [2019] Special Permit containing Condition 4" that deprived them of their substantive due process rights. Id. The plaintiffs claim to have sufficiently identified the PZC as the body with final policymaking authority. Id. The court agrees with the plaintiffs.

It is well-established that a municipality may not be held liable on a 1983 claim based on a theory of respondeat superior. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). However, a municipality may be held liable "if the conduct that caused the unconstitutional deprivation was taken pursuant to: 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[,] . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.'" Jeffes v. Barnes, 208 F.3d 49, 56–57 (2d Cir. 2000) (quoting Monell, 436 U.S. at 690–91). "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy", the court's role is to determine "whether that official had final policymaking authority in the particular area involved." Id. at 57.

There is no question that the PZC had final policymaking authority in this case. Connecticut General Statutes recognize the existence of municipal planning and zoning commissions. See Conn. Gen. Stat. § 8-4a ("Any town, city or borough, unless otherwise provided by special act, may by ordinance or by vote of its legislative body designate its zoning commission or its planning commission as the planning and zoning commission for such municipality, and such commission shall thereupon have all the

10

powers and duties of both a planning commission and a zoning commission . . . ."). The General Statutes further provide that

> The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality[, inter alia,] the location and use of . . . land for trade, industry, residence or other purposes . . . . Such zoning regulations may provide that certain . . . kinds of . . . use of land are permitted only after obtaining a special permit . . . from a . . . combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may . . . designate . . . .

Conn. Gen. Stat. § 8-2(a)(1)–(3).

Brooklyn's PZC has the authority to adopt, amend, and repeal zoning regulations—indeed, the version of Town of Brooklyn's Zoning Regulations, adopted generally on May 24, 1972, and effective July 1, 2018, provides that "Regulations and boundaries shall be established, changed or repealed only by a majority vote of all the members of the Zoning Commission . . . after a Public Hearing." Town of Brooklyn, Connecticut Zoning Regulations ("Brooklyn Zoning Regulations"), Def.'s Ex. A at 128 (Doc. No. 43-3). Along with the Zoning Enforcement Officer ("ZEO"), who "shall be appointed by the Planning and Zoning Commission[,] . . . the Planning and Zoning Commission shall enforce these regulations and order in writing the remedying of any condition found to exist in violation of these regulations." Id. Further and critical to the instant case, the PZC is tasked with approving special permits and may grant these approvals "subject to appropriate conditions and safeguards necessary to conserve the public health, safety, convenience, welfare, and property values in the neighborhood." Id. at 72. Finally, the Brooklyn Zoning Regulations provide that landowners, like Mr. Jolley, "proposing to remove loam, sand, gravel, or other fill from one piece of land for

11

use elsewhere . . . shall . . . make application to the Planning and Zoning Commission for a Special Permit for such operation." Id. at 107.

In sum, the PZC has the authority to create, amend, repeal, enforce, and grant Special Permits pursuant to the Town of Brooklyn's Zoning Regulations, and it is therefore a final policymaker for the Town. The plaintiffs have a viable Monell claim against Brooklyn. See, e.g., Wiltzius v. Town of New Milford, 453 F. Supp. 2d 421, 436 (D. Conn. 2006) (holding that the plaintiff properly brought a Monell claim against the Town of New Milford based on the actions of its Zoning Board of Appeals, which represented official town policy).

### B. Substantive Due Process

To succeed on their claim of a violation of substantive due process rights, the plaintiffs are required to show that (1) they "had a valid property interest," and (2) the "defendant[ ] infringed on that property right in an arbitrary or irrational manner." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 784 (2d Cir. 2007); see also Harlen Assocs. v. Incorp. Vill. of Mineola, 273 F.3d 494, 503 (2d Cir. 2001). Brooklyn argues that the plaintiffs' substantive due process claim fails as a matter of law because they cannot establish either required element.

#### 1. Protectible Property Interest

Brooklyn argues that the plaintiffs "did not possess a protected property interest in Condition 4 of the [2019 S]pecial [P]ermit [because] the special permit process is discretionary." Def.'s Mem. at 5. Although Brooklyn "attempts to frame [the] due process claim as asserting a protected property interest in a special permit," the plaintiffs explain, "that is not the nature of the . . . claim." Pl.'s Mem. at 6. Rather, the

12

plaintiffs claim to have a protectible property interest "in the form of a preexisting, nonconforming use to import sand and gravel from offsite for processing on the property." Id. The plaintiffs emphasize that the [PZC] "lacks discretion to prohibit completely", through the addition of Condition 4 to the 2019 Special Permit, "the continuation of a valid, preexisting nonconforming use". Id. at 7. The court agrees with the plaintiffs.

In Taylor v. the Zoning Board of Appeals of the Town of Wallingford, the Connecticut Appellate Court held unequivocally that "[t]he right to continue an established nonconforming use of one's property is securely grounded, both in statutes and in previous decisions of this court and our Supreme Court." 65 Conn. App. 687, 693 (2001). In fact, it is "a fundamental zoning precept in Connecticut that zoning regulations cannot bar uses that existed when the regulations were adopted." Id. at 694 (internal quotation marks removed; alteration adopted) (quoting Beckish v. Planning & Zoning Comm'n, 162 Conn. 11, 16 (1971)); see also Conn. Gen. Stat. § 8-2(d)(4)(A), (D) ("Zoning regulations . . . shall not . . . [, inter alia,] [p]rohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations . . . [or] terminate or deem abandoned a nonconforming use, building or structure . . . ."). In Connecticut, the "continuance of a nonconforming use protects the right of a user to continue the same use of the property as it existed before the date of the adoption of the zoning regulations." Taylor, 65 Conn. App. at 694 (emphasis in original) (citing Cioffoletti v. Plan. & Zoning Comm'n, 24 Conn. App. 5, 8 (1991)). "A lawfully established nonconforming use is a vested right and is entitled to constitutional

protection." Id. at 694 (quoting Petruzzi v. Zoning Bd. of Appeals, 176 Conn. 479, 483–84 (1979)) (internal quotation marks omitted).

The plaintiffs argue that this court should give preclusive effect to the Connecticut Superior Court's determination in the State Court Appeal that the plaintiffs have a preexisting, nonconforming use in the form of importing material to the Property. Pl.'s Mem. at 12. The court disagrees.

Collateral estoppel "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 32 (2d Cir. 2017) (internal quotation marks omitted). "An issue decided against a party in a prior proceeding may not be relitigated if: (1) it was fully and fairly litigated in the first action; (2) it was actually decided; and (3) the decision was necessary to the judgment." Id. (internal quotation marks omitted); see also Mazziotti v. Allstate Ins. Co., 240 Conn. 799, 813 (1997) (requiring an "identity of issues between the prior and subsequent proceedings [to find collateral estoppel,] and [noting that it] operates only against the same parties or those in privity with them"); Lyon v. Jones, 291 Conn. 384, 406 (2009) (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)) ("An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined."). A decision was necessary to the judgment "if[,] in the absence of a determination of the issue, the judgment could not have been validly rendered." Lyon, 291 Conn. at 406 (citing Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure § 11.19 (3d ed. 1985)).

The Connecticut Supreme Court has emphasized that the requirement that an issue be "essential to the judgment" before it has collateral estoppel effects is critical because (1) the "decision on an issue not essential to the prior judgment may not have been afforded the careful deliberation and analysis normally applied to essential issues, since a different disposition of the inessential issue would not affect the judgment" and (2) the "decision on an inessential issue in the prior judgment was not subject to the important safeguard as to its correctness, to wit: a contested review on appeal." Scalzo v. City of Danbury, 224 Conn. 124, 129 n.5 (1992) (citing Halpern v. Schwartz, 426 F.2d 102, 105 (2d Cir. 1970)). "An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." Jackson v. R.G. Whipple, Inc., 225 Conn. 705, 714–15 (1999), abrogated on other grounds by Macomber v. Travelers Prop. & Cas. Corp., 261 Conn. 620 (2002) (quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure § 11.19 (3d ed. 1985)). The Connecticut Supreme Court has repeatedly held the same. See, e.g., Dowling v. Finley Assocs., Inc., 248 Conn. 364, 374 (1999); Delahunty v. Mass. Mut. Life Ins. Co., 236 Conn. 582, 600-601 (1996). The State Appeal Court's determination that the plaintiffs had a valid preexisting nonconforming use in the importation of sand and gravel was one such decision because it was decided in the alternative to that Court's holding. See Brooklyn Sand & Gravel, LLC, 2020 WL 8415076, at *7 (stating that it "believes that the conflict of interest discussed above is sufficient to invalidate Condition 4 of the permit" before going on to "address the other arguments raised by the plaintiffs"). The determination that plaintiffs have a valid preexisting, nonconforming use, therefore, does not have collateral estoppel effects.

The plaintiffs have, however, come forward with evidence upon which a reasonable jury could find that the Brooklyn Property has been used in a similar manner since at least the early 1960s, Pl.'s LR 56(a)2(ii) Stmt. at ¶¶ 4–6, and that it housed a sand and gravel business since the early 1970s, id. at ¶ 7. Moreover, the plaintiffs have provided evidence that, while Brooklyn first adopted zoning regulations in 1972, it was "many years" before Mr. Jolley became "required to obtain a permit in order to process sand and gravel, whether it was material excavated from onsite or imported from offsite." Id. at ¶ 10. A reasonable jury could, therefore, find that the plaintiffs' use of the Brooklyn Property to import sand and gravel predated the imposition of the zoning requirement that sand and gravel businesses obtain special permits to operate.

Brooklyn has not offered any evidence to the contrary. Brooklyn instead argues that the plaintiffs have waived their right to claim a preexisting nonconforming use because the question was not before the PZC. Def.'s Mem. at 13. The plaintiffs have, however, come forward with evidence upon which a reasonable jury could find that the PZC was aware of the nonconforming use. The transcript of the PZC's April 3, 2019 Regular Meeting reflects that Ms. Sigfridson spoke regarding the plaintiffs' variance requests to the ZBA. 4/3/19 PZC Meeting Transcript at 14:31–33. She told the PZC that the plaintiffs claimed a hardship stemming from the fact that "that the subject property has historically processed imported material as well as material mined on site and that that predates zoning". Id. This suggests that the PZC knew, before it granted the 2019 Special Permit Application, that the plaintiffs were "claiming that they're grandfathered." Id. at 14:33–35. Brooklyn's argument is therefore without merit.

A reasonable jury could find, based on the evidence in the record, that the plaintiffs operated a sand and gravel business in the same way before the imposition of zoning regulations requiring special permits.  The plaintiffs have identified, at a minimum, a genuine dispute of material fact as to whether they had a valid preexisting nonconforming use in the form of importing sand and gravel to the Brooklyn Property. See, e.g., Taylor, 65 Conn. App. at 696 (2001) ("Because the use of the plaintiffs' property as a sand and gravel operation predated the institution of zoning ordinances in the town, the plaintiffs acquired, and continue to have, a valid, preexisting nonconforming use."). The court concludes, therefore, that the plaintiffs have, at a minimum, established a genuine dispute of material fact as to whether they possessed a protectible property interest in the form of a valid preexisting nonconforming use of the Brooklyn Property to import sand and gravel.

        2.    Arbitrary Deprivation

Brooklyn argues that, even if the plaintiffs "can prove they possessed a protected property interest in the right to import sand and gravel, [they] cannot prove that they were deprived of such interests with the high-level of egregious conduct required to make out the second element of a substantive due process claim."  Def.'s Mem. at 14.  The court disagrees.

To establish a substantive due process violation with respect to a land use issue, the plaintiffs "must show that the [defendant's] alleged acts against their land were 'arbitrary,' 'conscience-shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" Ferran v. Town of Nassau, 471 F.3d 363, 369–70 (2d Cir. 2006) (internal citation omitted).  A violation of substantive due process requires

17

"conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 259 (2d Cir. 1999). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level" and therefore support a substantive due process claim. County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). However, conduct that exceeds the authority vested in a government body may also support a substantive due process violation. "The touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974). For example, the Second Circuit has held that, where a town board "did not have authority for the actions it took regarding" a plaintiff's property, such "actions were ultra vires and, as a result sufficiently arbitrary to amount to a substantive due process violation." Cine SK8, Inc., 507 F.3d at 789. The Cine SK8, Inc. Court reasoned that government action "tainted with fundamental procedural irregularity . . . qualifies as arbitrary or irrational and hence as a violation of a plaintiff's substantive due process rights (provided it affects a valid property interest)." Id. (internal quotation marks omitted) (quoting Natale, 170 F.3d at 262). The Second Circuit has noted that actions taken without authority under state law, such as when a board lacks jurisdiction over property, may give rise to a trier of fact's conclusion that such actions violate substantive due process. See Brady v. Town of Colchester, 863 F.2d 205, 215–16 (2d Cir. 1988) (holding that "a trier of fact could conclude that" there was no "rational basis" for a zoning board's revocation of a landowner's building permit, where the board lacked authority under state law for such revocation).

Here, the plaintiffs have come forward with evidence upon which a reasonable juror could find several salient facts suggesting fundamental procedural irregularities. First, they have come forward with evidence suggesting that the imposition of Condition 4 was motivated, not by a desire to regulate the plaintiffs' preexisting, nonconforming use, but by a desire to end BS&G's business entirely. Pl.'s Mem. at 16; see also Pl.'s LR 56(a)2(ii) Stmt. ¶¶ 51–53, 59–62, 66–72. Next, they have come forward with evidence supporting a finding that Ms. Sigfridson, as the PZC's chairperson, had a conflict of interest and used her position to influence the PZC's deliberations. This tainted the PZC's special permit process, which the plaintiffs illustrated by coming forward with evidence of the PZC's unusual decision to submit a memorandum to the ZBA,[5] as well as the ultimate imposition of Condition 4 to the 2019 Special Permit. See Pl.'s LR 56(a)2(ii) Stmt. ¶¶ 52, 59, 66, 70.

The plaintiffs have likewise come forward with evidence upon which a reasonable juror could make the same findings supporting the same conclusions that the Connecticut Superior Court made in the State Court Action: (1) that Connecticut General Statutes section 8-11 was violated by Ms. Sigfridson's participation despite her conflict of interest, and that (2) Connecticut General Statutes section 8-2(d)(4)(D) was violated when the PZC attached Condition 4 to the 2019 Special Permit. These findings

---

[5] Brooklyn argues that this Memorandum should not be considered "conscious [sic] shocking as required to establish a violation of substantive due process" under the Noerr-Pennington doctrine and the First Amendment. Def.'s Mem. at 20. Even assuming, arguendo, that this doctrine applies in the instant case, its application simply bars liability on the basis of protected speech—the court is permitted to consider the memorandum as evidence of Ms. Sigfridson's influence and the procedural abnormality of the act itself. See, e.g., Gilead Cmty. Servs., Inc. v. Town of Cromwell, 432 F. Supp. 3d 46, 75 (D. Conn. 2019) ("[I]n any event, even if the Defendants could not be liable for their petitions to the Connecticut Department of Public Health, these actions could still be considered as evidence of their intent to discriminate more generally.").

"demonstrate that there is at least a genuine issue as to whether the process" by "the [PZC] was 'tainted with fundamental procedural irregularity'" and was therefore "sufficiently arbitrary to rise to a substantive due process violation." Cine SK8, Inc., 507 F.3d at 790 (internal citation omitted).

Brooklyn has therefore failed to establish that there is no genuine dispute of material fact with regard to the second substantive due process prong, and summary judgment in its favor is unwarranted.

## V.   CONCLUSION

For the foregoing reasons, the court hereby denies Brooklyn's Motion for Summary Judgment (Doc. No. 43).


**SO ORDERED.**

Dated at New Haven, Connecticut this 7th day of June 2023.


        /s/ Janet C. Hall
Janet C. Hall
United States District Judge